GEORGE W. HARSHAW, Administrator of the Estate of AARON W. HARSHAW, Deceased; Respondent. v. ST. LOUIS, IRON MOUNTAIN AND SOUTHERN RAILWAY COMPANY, APpellant.

Springfield Court of Appeals, July 28, 1913.

1. **RAILROADS: Highway Crossings: Injury at: Contributory Negligence.** Where a traveler, on account of obstructions on a railroad right of way, could not have seen a train as he approached a crossing until he was within a few feet of the tracks and no signals were given, *held* that he was not guilty of contributory negligence as a matter of law, in proceeding to that point.

2. ———: ———: ———: **Contributory Negligence.** Deceased, in attempting to cross a railroad track in front of a train with team and buggy, first saw and heard the train when his team was almost, if not entirely, upon the railroad track. Behind was a culvert covering a deep ditch, not wide enough for the team to turn on and the team was afraid of an engine. In this perilous position the traveler attempted to cross the track. *Held*, a question for the jury whether he was guilty of negligence.

3. **APPEAL AND ERROR: Reliance on One Error Only: Elimination of Others.** Where appellant in its brief stated that it sought a reversal of the judgment solely on the ground that the evidence failed to show any liability on its part, *held* to have eliminated from consideration of the court and waived all other alleged errors.

Appeal from Lawrence County Circuit Court.—*Hon. Carr McNatt*, Judge.

AFFIRMED.

*R. T. Railey, John L. McNatt, Barbour* and *Mc-David* for appellant.

(1) The defendant's demurrer at the close of the evidence for the plaintiff and its demurrer at the close of all the evidence should have been given.    Clark v. Railroad, 242 Mo. 605; Dyrcz v. Railroad, 238 Mo. 46; Hook v. Railroad, 162 Mo. 579; Schmidt v. Railroad, 191 Mo. 228; Sims v. Railroad, 116 Mo. App. 572; Baecker v. Railroad, 240 Mo. 518; McGee v. Railroad, 214 Mo. 545; Stotler v. Railroad, 204 Mo. 628; Laun v. Railroad, 216 Mo. 578; Sanguinette v. Railroad, 196 Mo. 488; Holland v. Railroad, 210 Mo. 350; Porter v. Railroad, 199 Mo. 96; Barrie v. Transit Company, 102 Mo. App. 87; Loring v. Railroad, 128 Mo. 359; Huggart v. Railroad, 134 Mo. 673; Ries v. Transit Co., 179 Mo. 7; Reno v. Railroad, 180 Mo. 481-482; Schaub v. Railroad, 133 Mo. App. 444; Moore v. Railroad, 176 Mo. 544.    (2)    As Mr Harshaw could have seen and heard the train he would be negligent in going upon the track; and the failure to give statutory signals would furnish no ground for recovery. Pope v. Railroad, 242 Mo. 238; Stotler v. Railroad, 204 Mo. 632; Green v. Railroad, 191 Mo. 142; Schmidt v. Railroad, 191 Mo. 228; Walker v. Railroad, 193 Mo. 479; Mockowik v. Railroad, 196 Mo. 570; McGee v. Railroad, 214 Mo. 545; Giardina v. Railroad, 185 Mo. 334; Porter v. Railroad, 199 Mo. 96; Ries v. Transit Co., 179 Mo. 7; Markowitz v. Railroad, 186 Mo. 357. (3) The evidence and the physical facts showed that the train was in plain view of the deceased before he went upon the track, and therefore the rate of speed was immaterial.    Stotler v. Railroad, 204 Mo. 630;

Schmidt v. Railroad, 191 Mo. 231; Green v. Railroad, 192 Mo. 139; Sanguinette v. Railroad, 196 Mo. 492; Walker v. Railroad, 193 Mo. 480-481; Holland v. Railroad, 210 Mo. 349; Porter v. Railroad, 199 Mo. 97; Kelsay v. Railroad, 129 Mo. 372; Loring v. Railroad, 128 Mo. 359; Schaub v. Railroad, 133 Mo. App. 444; Moore v. Railroad, 176 Mo. 544; Hook v. Railroad, 162 Mo. 581-582; Giardina v. Railroad, 185 Mo. 334-335; Higgins v. Railroad, 197 Mo. 314-318; Newton v. Railroad, 152 Mo. App. 170-173. (4) The evidence does not show that the condition of the crossing and the approach thereto (no matter what the condition was) had anything whatever to do with the injury. Porter v. Railroad, 199 Mo. 94; Sanguinette v. Railroad, 196 Mo. 492; Hayden v. Railroad, 124 Mo. 570-571; Moeller v. Railroad, 242 Mo. 725. (5) The conceded physical facts in this case show conclusively that if the deceased had looked and listened for the train before he drove on the track he would have seen and heard it. Weltmer v. Bishop, 171 Mo. 116; Van Dyke v. Railroad, 230 Mo. 278-279; Waggoner v. Railroad, 152 Mo. App. 179; Zalotuchin v. Railroad, 127 Mo. App. 584; Barrie v. Transit Co., 102 Mo. App. 91; Hook v. Railroad, 162 Mo. 580-582; Payne v. Railroad, 136 Mo. 584; Schaub v. Railroad, 133 Mo. App. 448; Ferguson v. Transportation Co., 79 Mo. App. 361; Reed v. Railroad, 112 Mo. App. 581; Stafford v. Adams, 113 Mo. App. 721; Demaet v. Storage Co., 121 Mo. App. 104; Dunphy v. Stock Yards, 118 Mo. App. 522.

*William B. Skinner* for respondent.

(1) The law imposes no rules of conduct upon one who is forced to escape as he may from impending danger that threatens him with great bodily harm. Donohue v. Railroad, 91 Mo. 357; Moberly v. Railroad, 17 Mo. App. 543; Lang v. Railroad, 115 Mo. App.

498; Boyce v. Railroad, 120 Mo. App. 175; McFern v. Gardner, 121 Mo. App. 12; Feeney v. Railroad, 123 Mo. App. 430; Jewell v. Manufacturing Co., 143 Mo. App. 200; Ransom v. Depot and Express Co., 142 Mo. App. 368; Weigman v. Railroad, 223 Mo. 699; Root v. Railroad, 195 Mo. 348; Bischoff v. Railroad, 121 Mo. App. 225; Kleiber v. Railroad, 107 Mo. 247; Byars v. Railroad, 161 Mo. App. 706. (2) It is obligatory upon those in charge of railroad trains to exercise a degree of caution and circumspection in approaching public road crossings, commensurate with the danger to travel by the public, so that the law should not be so applied to the citizen as to impose the whole responsibility on him for any injury that might ensue. Moberly v. Railroad, 17 Mo. App. 543; Johnson v. Railroad, 77 Mo. 546. (3) The condition and character of the approaches to railroad tracks which are required to be built and maintained by railroads, at crossings of public roads, are to be considered, when justified by the evidence, as producing causes of the injury in actions against railroads for injuries arising from failure to give statutory signals at public road crossings. Moberly v. Railroad, 17 Mo. App. 518; Day v. Railroad, 132 Mo. App. 715- 716. (4) In the absence of direct evidence or rebutting circumstances the deceased, Aaron W. Harshaw, in attempting to cross the railroad track is presumed to have been in the exercise of proper care in looking and listening for approaching trains. Moberly v. Railroad, 17 Mo. App. 546; Riska v. Railroad, 180 Mo. 168; Stotler v. Railroad, 200 Mo. 146; Weigman v. Railroad, 223 Mo. 718-720. (5) A citizen who approaches, on a public highway, a railroad crossing, and who can neither see nor hear, on account of the topography of the country and other obstructions and hindrances, an approaching train, may rely upon the required signals, venture upon the track and not be chargeable with negligence. Zimmerman v. Railroad, 70 Mo. 486-487; Kennedy

v. Railroad, 45 Mo. 255; Elliott v. Railroad, 105 Mo. App. 523; Weigman v. Railroad, 223 Mo. 718-721.

(6) The defendant cannot impute a want of vigilance to one injured by his act— as negligence—if that very want of vigilance were the consequence of an omission of duty on the part of the defendant. Kennayde v. Railroad, 45 Mo. 262; Donohue v. Railroad, 90 Mo. 263; Weighman v. Railroad, 223 Mo. 718. (7) The measure of precaution to be observed by a traveler at railroad crossings of public roads depends often upon the circumstances and surroundings. When the view of the railroad is obstructed, the question of whether the traveler was wanting in due care is one for the jury. Baker v. Railroad, 122 Mo. 543; Mitchel v. Railroad, 122 Mo. App. 57.

ROBERTSON, P. J.—On May 28, 1912, Aaron W. Harshaw was killed at a crossing on the defendant's railroad by a passenger train and on August 9, 1912, the plaintiff, as administrator of his estate, brought this suit under section 5425, Revised Statutes 1909, alleging a failure of the defendant to ring the bell or sound the whistle as required by section 3140, Revised Statutes 1909.

The testimony introduced at the trial discloses that the crossing at which the accident occured is on a public road, running north and south, through what is called Bowers Mill in Lawrence county; that the crossing is 2420 feet east of the station of Larussell, which is on the south side of the defendant's railroad. The place called Bowers Mill is a little settlement in which there is a store, hotel, livery stable and some other buildings north of the crossing about a thousand feet and some residences a short distance south of the crossing. The train which caused the accident was coming from the east upon a track that enters a cut 2237 feet east of the road crossing, runs through the cut 800 feet in a northwesterly direction and passes a mile post 98 feet further on towards the station,

curves slightly to the southwest and 533 feet east of the crossing passes what is called the red elevator or mill south of the track, and at 450 or 454 feet east of this crossing it crosses an old wagon road with an old approach on the north side of the track, and at 367 feet east of the crossing where the collision occurred it passes what is called the white elevator on the south side of the track. The track is on a fill eight feet above the natural surface of the wagon road which decreases towards the cut. On the north side of defendant's railroad, at the crossing where the collision occurred, it constructed an incline approach for the wagon road and placed thereon a culvert sixteen feet wide, made of planks. The south edge of this culvert is twenty-nine feet from the north rail of defendant's track and the north edge of the culvert is twenty-three feet south of where the fill commences. The top of the culvert is six feet eight inches from the ground or bottom of the ditch over which it is built.

On the morning of the accident, which was a bright, clear day, at about 10:30, the deceased and his aged wife were driving south on this public road in a buggy drawn by two horses and as they passed over this crossing the rear portion of their buggy was struck by the engine of defendant's train and both of them were killed, the wife dying instantly and the husband surviving only a short time.

It is undisputed that the train came through the cut at the rate of forty-five or fifty miles an hour, but there is some dispute as to the ringing of the bell or the sounding of the whistle and as to the obstructions which were upon the old approach north of the railroad 450 or 454 feet east of this public road crossing where the collision occurred.

There were four persons who crossed the railroad track at this crossing shortly before these old persons were killed, and their attention was particularly directed to the train because they knew the time the train

was due and remarked as they were going over the track that it was about train time, and one of them took out his watch and observed the time, and they continued to watch the deceased and his wife and when these witnesses were about 117 steps south of the railroad crossing they first saw and heard the train, after all of the coaches had passed the white elevator, and they then first heard any signal given. There are numerous other witnesses who testified that no signals were given until the train had reached the white elevator or some point near there. From the cut to the crossing the grade is descending until the station in Larussell is reached.

There is an abundance of testimony to the effect that one approaching the crossing where the collision occurred from the north could not see beyond the old crossing until they had advanced upon the culvert to within about eighteen of twenty feet of the railroad track. There is other testimony to the effect that eighty feet north of the defendant's track neither cars nor engines thereon could be seen approaching from the east. Others testified that at the time one started up the grade at the crossing it was impossible to see a train east of the old crossing. There was also the testimony of a witness to the effect that for the entire distance of 880 feet north of the crossing there were only short intervals, of about one-half that distance, where a train could be seen beyond the old crossing, and, as the witness was indicating on a plat, we infer that the last point at which the witness testified a train could be seen was a considerable distance north of this crossing.

The section foreman of the defendant who had in charge the right of way along the portion of the defendant's track in controversy was a witness and testified that in September and October, 1911, there were cut off of the right of way, under his supervision,

"weeds and some new sumac, blackberry briars. That was about all. Maybe a few sprouts."

The appellant presents its case here on the theory that the physical facts were such that it must be held as a matter of law that the deceased could have seen the train had he looked or heard it if he had listened before he arrived at a place of danger and could, had he exercised these senses and exercised reasonable care, have avoided the collision. The appellant assumes that even when the deceased was yet north of the track and south of the culvert, and when the train at that time was coming past the mill and elevator, that by the exercise of reasonable care, he could have avoided the accident or should not have undertaken to go upon the defendant's track; but upon this point we are of the opinion that the appellant misconstrues the law and the facts.

If, as the jury must have found, there being much testimony tending to prove it, the defendant's right of way was obstructed so that the deceased, before passing over the culvert, could not have seen the train if he had looked, and if there were no signals given by the defendant and the deceased could not have heard the train had he listened, then, up to the point where he was, as all of the witnesses who saw him (including the fireman and engineer on the defendant's engine) testified, it could not be said as a matter of law that the deceased was negligent in proceeding up to that point. [Baker v. Railroad, 122 Mo. 533, 544, 26 S. W. 20; Weigman v. Railroad, 223 Mo. 699, 123 S. W. 38; Donohue v. Railroad, 91 Mo. 357, 361, 363, 2. S. W. 424, 3 S. W. 848.]

If the deceased had reached the point between the south end of the culvert and the defendant's tracks even before he was guilty of contributory negligence, then it is insisted by the appellant that we should hold that he was guilty of contributory negligence and that the plaintiff cannot recover because the deceased should

not have continued onto the defendant's tracks. Under those conditions, considering his perilous situation, from that point on, under the authorities, it is clearly a question for the jury which, in this case, has been passed upon by them and resolved against the appellant and, therefore, we are relieved of any further discussion upon that point. [Kleiber v. Railway, 107 Mo. 240, 247, 17 S. W. 946; Donohue v. Railroad, 91 Mo. 357, 365, 2 S. W. 424, 3 S. W. 848; Byars v. Railroad, 161 Mo. App. 698, 706, 141 S. W. 926; Feeney v. Railroad, 123 Mo. App. 420, 431, 99 S. W. 477; Ransom v. Depot and Express Co's., 142 Mo. App. 361, 369, 126 S. W. 785.]

When the deceased reached the point between the south end of the culvert and the defendant's tracks he was in a position where under the conditions there existing a reasonably prudent person may have concluded that the safest course to pursue was to undertake to cross the tracks rather than to get his team back off of the track, as some of the witnesses testified the team was on the track; or, if the team was not on the track, then he may have considered it too dangerous to remain on or near the culvert and crossing where his team might precipitate the buggy and its occupants off of the culvert, as some of the witnesses testified the team was afraid of even a thrasher engine. Some of the witnesses testified that the deceased was making desperate efforts to get across the tracks by slapping his team with the lines and the physical facts disclose that he almost succeeded. Under these facts which must have been found by the jury, we are clearly of the opinion that on account of the defendant's negligence he was in a perilous position and that the defendant cannot now be heard to say that the deceased might have taken a safer course. We doubt very seriously if, after a thorough consideration of the situation in this case by the appellant, a safer course than the one pursued by the deceased could be suggested by it.

The argument in appellant's printed brief filed herein begins with this statement: "The sole ground upon which appellant seeks a reversal of this cause is, that the evidence wholly fails to show any liability on the part of the defendant, and that upon the whole record the trial judge should have directed a verdict for the defendant." And further along in the argument, after referring to alleged errors in instructions given in behalf of the plaintiff and requested in behalf of defendant and refused, it is said: "Although we would unquestionably be entitled at least to a new trial, on account of these errors, we do not seek it and stand squarely on the proposition first stated, viz: That this case should be reversed outright, because the evidence absolutely fails to show any liability on the part of the defendant."

We are clearly of the opinion that this was a case for the jury and that consequently the court did not err in refusing to instruct the jury to return a verdict for the defendant and, as the appellant in its brief eliminates from our consideration every other proposition involved, we affirm the judgment of the trial court. *Sturgis, J.,* concurs. *Farrington, J.,* concurs in part in a separate opinion.


## CONCURRING OPINION.

STURGIS, J.—I fully concur with ROBERTSON P. J., in his opinion in this case and do not concur with FARRINGTON, J., in the construction of section 5425, Revised Statute 1909, as regards the measure of damages applicable in cases prosecuted under that section and in requiring the plaintiff in this case to remit the damages recovered in excess of the minimum amount of $2000 allowed by that section. The effect of his opinion is to make said section purely and solely compensatory as to any verdict in excess of the minimum amount of $2000; or, perhaps more properly speaking,

makes it compensatory in all respects with a minimum liquidated damage of $2000. Under that ruling the penalty provision begins and ends with the minimum amount of $2000, as it formerly did with the fixed amount of $5000, notwithstanding the statute says the offending party shall forfeit and pay as a penalty the sum of not less than $2000 and not more than $10000, making the sum assessed by the jury a penalty whatever it may be within those limits. The effect of this opinion is to require the plaintiff in all cases arising under said section 5425, where he seeks a judgment in excess of the minimum amount, to produce evidence showing a pecuniary loss to himself or those for whose benefit he brings the action in excess of such minimum amount, and in the absence of such evidence the jury must be instructed to return a verdict for $2000, no more and no less, notwithstanding the statute in question plainly says that in all cases arising under said section the amount forfeited as a penalty shall within the maximum and minimum limit be "in the discretion of the jury." The result also is that in all cases arising under the fourth subdivision of the parties who may sue under said section—that is where the administrator or executor sues in the absence of all the legally dependent classes—the amount to be recovered is $2000, no more and no less; for in such cases, there being no legal dependency of those for whose benefit the suit is brought, there cannot be a pecuniary loss to them in excess of said minimum amount, or in any amount, as that term is used in this connection. [Parsons v. Railroad, 94 Mo. 286, 299, 6 S. W. 464.]

Of course I am not now speaking of those cases where what is termed punitive or exemplary damages, based on malice, wantonness, recklessness, conscious negligence, or evil intent, may be awarded as regulated by section 1796, Revised Statute 1909. Such damages more properly belong to cases brought under sections

5426-7, which are purely compensatory, rather than those brought under section 5425, now in question; and such damages are allowed in a great variety of cases independent of either statute. [13 Cyc. 105; Buckley v. Knapp, 48 Mo. 152; Morgan v. Durfee, 69 Mo. 469; McNamara v. Transit Co., 182 Mo. 676, 81 S. W. 880; Goetz v. Ambs, 27 Mo. 28; Beck v. Dowell, 111 Mo. 506, 20 S. W. 209; Barth v. Railroad, 142 Mo. 535, 558, 44 S. W. 778; Minter v. Bradstreet Co., 174 Mo. 444, 73 S. W. 668; Gray v. McDonald, 104 Mo. 303, 16 S. W. 398; Vawter v. Hultz, 112 Mo. 633,.20 S. W. 689.] As section 5425 says nothing about aggravating or mitigating circumstances, it is at least doubtful whether or not punitive damages can be allowed under this section. There could be no punitive damages added to a recovery already a penalty.

I find no difficulty whatever in holding that said section 5425 is both penal and compensatory. That is the only sensible construction of it. As shown by the cases cited in Boyd v. Railroad, 236 Mo. 54, 84, 139 S. W. 561, the old statute fixing $5000 as the sole and only amount to be recovered was in a way both penal and compensatory. Of course when the amount of the recovery was a fixed sum of $5000, whether such sum be called a penalty or liquidated damages, in all cases where the facts brought it within the provisions of the statute, of necessity there was and could be no measure of damages to be considered and applied by the jury and no evidence could be admitted tending to show or establish any element or measure of damage. The statute having fixed the damage at a definite sum, the same was already measured. The amendment of 1905 emphasized and enlarged the compensatory features of this section by leaving it to the discretion of the jury to fix the amount of the forfeit to be paid by the wrongdoer. As said in the Boyd case, supra, at page 93: "In other words, the section under which the suit is brought does not call for any measure of

damages. It provides for a minimum and a maximum and the exercise of a discretion by the jury between the two extremes. That discretion was certainly not intended for the exercise of mere whim, caprice, or prejudice. As the statute has a remedial side to it, the jury may consider the extent of the injury to be remedial; and as it has a penal side, the jury have the right to consider the facts of the negligence in determining the amount to be allowed under that phase of the case.

It is also sound law to hold that where the plaintiff seeks a verdict in excess of the fixed minimum amount of $2000, then, as such amount is to be determined within the fixed limits "in the discretion of the jury," the jury should have before it all the facts necessary and proper to be considered by it in exercising that discretion, both with reference to the penal and compensatory features of the statute; that is the facts bearing on both the compensatory and penal elements of the case. It is therefore proper as bearing on the compensatory features of the case to admit evidence of the age, condition of health, earning capacity of the deceased and such circumstances in life as properly bear on the pecuniary loss of the parties bringing or for whom the action is brought. Such was the holding of the Supreme Court in Boyd v. Railroad on both the first and second appeals, 236 Mo. 54, 139 S. W. 561 and 249 Mo. 110, 155 S. W. 13. It is correctly said in the last appeal of said case, 155 S. W. 13, 16: "It would be absurd to say that the Legislature believed juries so infallible that they could render correct verdicts without a knowledge of the facts upon which their discretion must operate; so we have a right to infer that by the use of the broad word 'discretion' it was intended that the jury should be fully acquainted with the facts of each case, to the end that they might be prepared to exercise a wise discretion— a discretion to promote justice. . . . When courts or juries

are clothed with power to exercise discretion in the performance of duties cast upon them by the law, the power to acquire a full knowledge of the facts upon which that discretion must operate is necessarily implied."

The question now to be decided is whether, after the jury has heard the evidence adduced by the respective sides as to the age, health, earning capacity of the deceased, who the beneficiaries of the action are and their relationship and dependence or nondependence on the deceased and all the facts bearing on the pecuniary loss of the beneficiaries of the action on the one hand, and all the facts and circumstances of the defendant's negligence resulting in the killing of the deceased on the other hand, shall the jury in all cases be allowed to exercise the discretion given by the statute in assessing as a penalty or liquidated damages a sum not less than two or more than ten thousand dollars; or can the court by placing the damage to be allowed in excess of the minimum statutory amount on a purely compensatory basis say that the evidence as to compensatory damages does not warrant a larger amount than the minimum fixed by statute and direct a verdict for that amount, thus depriving the jury of all discretion? I am not willing to say that such is the law in the absence of a direct ruling to that effect by our Supreme Court. It seems plain to me that the proper construction to be given to the statute in question is that the jury, after hearing all the proper evidence bearing on both the compensatory and penal sides of the statute, and being fully advised as to what facts are to be taken into consideration and what excluded in the exercise of their discretion, must then be left to exercise that discretion within the limits fixed by the statute—a discretion to be interfered with by the court, if at all, only when abused. [Ellis v. Street Railroad, 234 Mo. 657, 688.]

No construction of the statute should be made that totally ignores the penal side of the statute except as to the minimum amount. Such is not the reading of the statutes. It makes the recovery a penalty, whether minimum, maximum or intermediate. The penalty feature is plainly and unmistakably expressed in the statute itself. It is only by construction that the compensatory feature is injected into it. As said by the court in Murphy v. Railroad, 228 Mo. 56, 86, 128 S. W. 481, "In one permissible view of the new statute (and the one most obvious) it is penal and nothing else. The lawmakers said so. But when the whole statute is read and harmonized it might appear (by construction) that the minimum amount is left alone as nakedly and baldly penal, and that the discretion of the jury to go above that amount might be gauged on the theory of compensation, as pecuniary loss, or, if not that, as having regard to the aggravating or mitigating circumstances of the individual case."

My contention is that while it is proper and necessary, in order to carry out the legislative intent and accomplish the correction of the evil existing under the old statute, to construe the amended statute as including a compensatory element, yet it is neither proper nor necessary by mere construction to totally exclude the penal feature of the statute after passing the minimum amount. The statute makes no such distinction. If penal at all, it is penal throughout. That is, it is solely penal as to the minimum amount and both penal and compensatory as to any larger amount. The reading of the statute will show that it does not even mention the amount to be sued for and recovered as being *damages* or treat it as such. It is denominated a "penalty" which the offender must 'forfeit and pay" for his wrongdoing. Why then should the court lose sight of and totally ignore the wrongdoing, the penalty, the forfeiture, as soon as it passes the minimum amount. In my judgment the

statute does not say either in terms or by necessary or even permissible construction that in cases arising under this statute that the amount to be recovered is a penalty so far as the minimum amount is concerned, but beyond that amount it ceases to have any penal features and becomes purely and solely compensatory just like the following sections, 5426-7. A reading of the section in question in contrast with the following compensatory sections shows that they are widely, if not totally, different in this respect. The section in question contains no measure of damages. The next one does, in that the amount to be recovered is called damages and is limited to what is "fair and just with reference to the necessary injury resulting from such death to the surviving parties who may be entitled to sue." Nor is there anything in section 5425 relative to aggravating or mitigating circumstances. Such would not be necessary or proper where the amount to be recovered is partially or totally penal in its nature. It seems to me nothing but judicial legislation to suppress the penal feature of the statute after passing the minimum amount allowed to be recovered, and not only to read into the statute a compensatory feature after reaching that amount, based largely, if not entirely, on the discretion given to the jury in fixing the amount, but to make the statute purely and solely compensatory with a measure of damages borrowed from the next and radically different section.

That the penal, as well as the compensatory feature of the statute, should be retained throughout and in all cases falling within its provisions, is well expressed in the first appeal of the Boyd case, 236 Mo. 54, 92, 139 S. W. 561, as follows: "The jury should be told that if they find for the plaintiff they should allow her a sum not less than $2000 and not more than $10,000, in the discretion of the jury, and that in determining the amount they will allow, they may take into consideration the pecuniary loss occasioned to the plaintiff

by the death of her husband and also take into consideration the *facts constituting negligence* on the part of defendant causing the death.'' That the facts constituing negligence on the part of the defendant—the penal side of the statute—is to be taken into consideration in determining whether the amount to be recovered shall be $2000 or any amount up to $10,000, in a case not warranting punitive or exemplary damages, is shown by the holding of the court that the case then under consideration was not one warranting such punitive or exemplary damages. Referring to the first appeal of the Boyd case, supra, this court, in Hegberg v. Railroad, 164 Mo. App. 514, 549, 147 S. W. 192, said: ''that on the remedial side, the jury might consider the extent of the pecuniary injury; and, as it had a *penal side*, the jury had a right to consider the *facts of negligence* in determining the defendant's culpability and the amount of damages to be allowed under that phase of the case.''

In the case of Niehaus v. United Railways, 165 Mo. App. 606, 148 S. W. 389, which was a suit by an administrator, the court approved a verdict and judg- for $5000, and said, page 618: ''We may say, however, though it is not germane to any point involved, that if there had been anything in the case to justify it, then, under the last decision of our Supreme Court in Boyd v. Mo. Pac. Ry. Co., 236 Mo. 54, 139 S. W. 561, the question of pecuniary loss might properly have been submitted to the jury to be considered by them in determining the amount of their verdict *along with the facts bearing on the penal phase of the case.* But it was not necessary, under that decision, that such pecuniary loss be shown in order that plaintiff might be permitted to recover at all. In the absence of pecuniary loss the plaintiff would have a right to recover on the penal phase of the case alone, as was done here.''

It is contended that the views herein expressed are in conflict with the last opinion in Boyd v. Railroad, 249 Mo. 110, 155 S. W. 13. I do not so understand that case, especially when read in connection with the former opinion in the same case, 236 Mo. 264, 139 S. W. 561. In the first place the question now considered was not before the court for decision in that case and its discussion is merely incidental. The question there considered and decided was whether the statute in question is purely penal, admitting of no evidence as to compensatory damages; or, whether it was so far compensatory as to admit evidence of a compensatory nature. The sole question in that case bearing on the construction of this statute grew out of the admissibility of evidence of a compensatory character, to-wit, as to the number and ages of the plaintiff's minor children, and the age, condition of health and earning capacity of the deceased. The penal phase of the statute was not discussed because conceded. Like all court decisions, that one must be read and interpreted in the light of the point to be decided, because collateral matters are not likely to be thoroughly considered or the law governing the same accurately stated. Responding to the point at issue the court there said: "The more serious issue is what facts are juries allowed to consider in arriving at a verdict in excess of $2000. It might be urged that they are to consider *only circumstances attending the negligence*, unskillfulness, or criminal intent of the party or corporation causing the death for which recovery is sought, but it would be much more reasonable to suppose it was the legislative intent that in exercising its discretion as to the amount for which a verdict in excess of $2000 should be rendered the jury should *also* consider the necessary injury sustained by the party seeking the recovery." And again: "Upon a full consideration of this case in banc, we are convinced that it was the intention of the General Assem-

bly by the amendment of 1905 to leave the provisions of section 5425, supra, penal in their nature, so far as said section fixed the amount of recovery at not less than $2000, but where a plaintiff, as in this case, seeks to recover under said section a larger sum than $2000, the jury or court in preparing itself to exercise a wise and just discretion should receive evidence of the age, condition of health, and earning capacity of the party killed, and the consequent loss to the plaintiff thereby, *together with the facts and circumstances attending the killing*, for which damages are sought to be recovered.''

The only words of the majority opinion in that case giving color to the other construction of the statute are: ''In other words, a recovery under section 5425, Revised Statute, 1909, is penal up to the sum of $2000, but the extent to which a plaintiff may recover, if at all, in excess of $2000 under that section, is remedial and compensatory.'' But in view of what was really being discussed and decided, and what the court had previously said, it was evidently meant that ''a recovery under section 5425, Revised Statute 1909, is (purely) penal up to the sum of $2000, but the extent to which a plaintiff may recover, if at all, in excess of $2000 under that section, is (both penal and) remedial and compensatory.''

It is evident that the jury in this case did consider both the compensatory and penal sides of this statute and correctly applied the same to the facts in this case. The judgment is for $3000. It is evident that the jury took into consideration the fact that the deceased was old, his expectancy in life short, his earning capacity about gone, and that the beneficiaries in this action had no special claim on his bounty. It cannot be said that the jury abused its discretion in this case.

Holding these views, I agree that this case should be affirmed unconditionally.

## CONCURRING OPINION.

FARRINGTON, J.—This suit was instituted under section 5425, Revised Statute 1909, by the administrator of the estate of Aaron W. Harshaw, deceased, for the recovery of damages. Plaintiff recovered judgment for $3000 and defendant has appealed. Several assignments of error are made, but appellant in the oral argument and in its brief cast the appeal on the alleged error of the trial court in refusing to direct a verdict for it at the close of all the evidence, directing our attention, however, in the oral argument, to the case of Boyd v. Railroad which had been decided a short time before and had just been published in the advance sheets of the Southwestern Reporter (155 S. W. 13).

The acts of negligence charged in the petition are as follows:  " (1)   In failing to ring the bell, or sound the whistle, as provided by section 3140, Revised Statute 1909.   (2)   In running the train at an unusual, rapid or dangerous rate of speed, when approaching and passing over the crossing.   (3)   In failing to check the speed of or stop the train when by the exercise of care those in control of the train knew, or might have known, of the perilous position of the deceased upon and near the crossing. "

There is no evidence to invoke, and it is conceded that, the humanitarian doctrine does not apply to this case.

The answer was a general denial and a plea of contributory negligence.

The undisputed facts are that on May 28, 1912, Aaron W. Harshaw, and his wife, both in apparently good health and in reasonable possession of their senses, were driving south on a public road, or what some of the witnesses termed a street, in the unincorporated village of Bower Mills. This public road runs north and south, and defendant's railroad track

crosses the road at a slight angle, running northeast and southwest. The approach to the railroad track from the north begins on the public road sixty-eight feet from the center of the track and gradually rises until it reaches its highest point which is, of course, the railroad track. The rise from the point sixty-eight feet north of the center of the track to that place is between eight and ten feet. Near the middle of this approach, which is sixteen feet wide, is a bridge without railing, also sixteen feet wide, and seventeen feet long. From the south end of this bridge to the center of the railroad track is about thirty feet, and the center of the railroad track is about four feet higher than the center of the top of the bridge. The approach becomes higher and higher as it nears the railroad track, and from the ground where the water goes under the bridge to the top of the bridge is about six or seven feet. The approach, as it reaches the railroad track, is about ten feet high. It was shown that an ordinary team of horses walking from the sixty-eight-foot point to the railroad track will require about twenty-three seconds. Standing on the track and looking northeast up the track one can see a train practically a quarter of a mile, or from 1300 to 1400 feet. This point would be where the track turns from a northeast direction to a southeast direction, looking up the track toward where the train came from that took part in this accident. Just out of and west of this curve is located a whistling post, being 1339 feet from the center of the road crossing in question, and the track from the whistling post is down grade to the crossing. The defendant's right of way is 100 feet wide, and fifty feet of the public road approach, including the bridge, is on the right of way. The train was running forty-five or fifty miles an hour; it is conceded by appellant that the evidence shows it was traveling about seventy-three feet per second. It was four or five minutes late on the day of the acci-

dent and was running faster than usual to make up the time. That the train gave a warning signal after it was within 350 or 300 féet of the crossing is established beyond dispute in the evidence, and that the train was plainly visible and clearly heard from a point 450 to 454 feet east of the crossing is also proven. At this 454-foot point is what is known in the evidence as the "old road crossing" about which much dispute arises as to obstructions growing thereon.

The deceased and his wife were driving a team of horses hitched to a rather low buggy. There is evidence that deceased generally drove a good team of horses. The serious conflict in the evidence in this case is as to how far up the track the train could be seen as the deceased approached the track in the buggy. There is substantial testimony by witnesses for the plaintiff that on the "old road crossing," which was located 454 feet east of the road on which deceased was traveling, grew elder bushes and sumac and weeds which would obstruct the view northeast up the track until a traveler going south on the road had reached a point within twenty feet of the railroad. On the other hand, some of plaintiff's witnesses, and defendant's witnesses, swear that owing to the fact that the track was much higher than the fill and because of an old slough that was on the north side of the track, a train could be seen coming out of the cut some 1300 or 1400 feet away.

In any event, taking the rate of speed the train was traveling and the rate deceased was traveling in his buggy together with the testimony of the engineer and fireman who testified for the defendant, it is clear that when the train came out of the cut some 1300 or 1400 feet away from the crossing, the deceased was near the bridge. There were some witnesses who testified that deceased traveled at the slow gait he was going all the way up the approach and onto the railroad track. Other witnesses testified that he stopped

on the bridge. Some say that before he went upon the track his horses became nervous and that he was seen slapping them with the reins and urging them along. There is no testimony that he looked or listened at any time before entering upon the track. Much conflict appears in the record as to the crossing signals. A number of witnesses who were in close proximity to the crossing and to the deceased, some of whom were listening and expecting the train, swear positively that no signal was given until the distress signal was heard when the train was bearing down upon the deceased some 250 to 350 feet distant. Several witnesses who had just crossed the track in a wagon ahead of the deceased and who were expecting and listening for the train and had only reached a point 117 steps south of the track when the accident occurred, say that the first they heard of the approaching train was the noise it made as it passed a mill and elevator located on the south side of the track about 350 to 533 feet east of the crossing. The members of the train crew are corroborated by a number of witnesses in their testimony that the regular crossing signal was given by the approaching train.

There is much testimony, and several photographs were introduced in evidence and have been brought to this court, showing the condition of the country east of the public road toward the cut in the railroad right of way east of the crossing, but this is not material here for the reason that the evidence shows plainly that whether the track could be seen or not, the train could not be seen, not having come out of the cut, before the deceased and his wife had reached and started up the approach, the beginning of which was sixty-eight feet from the track. There is abundant testimony—by reason of which the verdict of the jury could not be disturbed—to support the finding that defendant failed to give the statutory crossing signal.

And there is testimony of a substantial character, affording a solid foundation upon which the verdict could stand, that there were such obstructions along the right of way as would cut off the view of the train until it had reached a point some 454 feet east of the crossing. Be that as it may, the testimony is practically undisputed that when the train came around the curve, some 1400 feet distant from the crossing, the deceased was near the bridge. As stated, this bridge was without railing and was six or seven feet high, and the ground from the bridge to the track gradually rises so that the embankment on each side of the railroad track is from eight to ten feet high. After getting on the bridge, and south of it, the road is too narrow to permit a team and buggy to safely turn around. The deceased of course had a right to occupy the place he did. There is evidence that his team was afraid of an engine and that they became nervous. It must be conceded that before deceased actually drove upon the track the train was in plain view and hearing at least 454 feet away. He was, therefore, as correctly stated by appellant, charged with a knowledge of the fact that the train was bearing down upon him.

In the light of these facts we are asked to say that in attempting to cross ahead of the train the deceased must be charged with negligence as a matter of law. This, no court could reasonably do. Confronted on the right and left by an embankment of from eight to ten feet in height, with not enough room in which to turn around, with an unrailed bridge to the rear, and with a nervous team which according to some of the witnesses was within four or five feet of the track when the train could first be seen by the deceased, he had to act in an emergency—already in a place of great danger. What he did, it is true, resulted disastrously, because the train caught the rear end of the buggy and deceased and his wife were killed.

Many cases in Missouri which are familiiar to
the bench and bar and need not be cited here, uphold
the doctrine that a railroad crossing in and of itself
is a warning of danger; that persons undertaking to
cross are charged with a duty of looking and listening
and caring for their own safety, and will not be permit-
ted to rely upon the presumption that the railroad
company will exercise due care in properly managing
its trains, when, by the exercise of due care its neg-
ligent acts could be detected and injury avoided by
the individual. But in no case do I find that a person
may be charged with contributory neglifence.as a mat-
ter of law under facts similar to those appearing in
this record, where, from the very incipiency of the
danger, and where, from his very surroundings, he
could first know of the approach of the train after he
had lawfully and in the exercise of ordinary care placed
himself in a perilous position. The law does not re-
quire one suddenly placed in a position of great peril
to exercise the degree of presence of mind which one of
ordinary prudence might exercise in the absence of
the danger. [Wyler v. Ratican, 150 Mo. App. l. c.
481, 131 S. W. 155.]

In reviewing the Missouri crossing decisions where
the individual has been charged with contributory neg-
ligence as a matter of law, he invariably could have dis-
covered his danger while yet in a place of safety and
could have extricated himself by the exercise of due
care and avoided injury. To hold the deceased—
surrounded as he was with danger— to that degree of
care which he must have exercised had he been in a
place of safety, would be an unwarranted extension of
the power of the courts.

It is also well established in this State that in the
absence of statutory and ordinance regulation, in cross-
ing county roads and going from station to station,
it is not negligence *per se* to run trains at a rate of
fifty miles or more per hour. The demands of busi-

ness and the prod of competition requires railroad companies to operate their trains at a great rate of speed. But to approach a public road crossing, *surrounded as this was*, at the rate of speed defendant's train was running, with the obstructions along the right of way testified to by some of the witnesses, there being some evidence that defendant failed to give the statutory signal, would certainly make a case for the consideration of a jury, to determine whether the giving of the statutory signal would have warned the deceased in time to have permitted him to stop before he, with his horses and buggy was upon the bridge, a place of imminent danger from which he could not turn or back without great danger. The failure to give the signal, under the statute, makes a prima facie case of negligence from which the defendant can only be relieved by showing to the satisfaction of the jury that such failure was not the proximate cause of the injury.

The evidence in this case fails to show any compensatory damages sustained. There is not a scintilla of evidence showing a pecuniary loss to any one by reason of the negligent killing of the deceased. It is conceded that the humanitarian doctrine does not enter into the case and there is therefore nothing that would indicate malice or wantonness or an aggravated case; yet the verdict of the jury was for $3000, which is $1000 more than the penalty fixed by the statute as construed in the recent decision of Boyd v. Railroad, 249 Mo. 110, 155 S. W. 13, and for the lack of such evidence, under the decision in the Boyd case, the verdict is, to the extent of $1000, excessive. The statute (section 5425, R. S. 1909) in this respect is not open to construction by this court because the Supreme Court has construed it and it is merely left to this court to follow that ruling. I understand the Supreme Court to mean what its plain and unambiguous language imports. Having had this question

under discussion and consideration in several cases, the majority opinion, in banc, in finally summing up the penal, remedial, and compensatory features of the statute, contains this language which to me is unambiguous and needs no analytical construction: "In other words, a recovery under section 5425, Revised Statute 1909, is penal up to the sum of $2000, but the extent to which a plaintiff may recover, if at all, in excess of $2000 under that section, is remedial and compensatory." GRAVES, J., in the opening sentence of his separate opinion in that case, places the same construction that I do upon the language of the majority opinion above quoted.

Although it is true appellant in its printed brief submitted the case on the sole question of whether contributory negligence did not bar a recovery, on oral argument appellant's counsel called attention to this passage of its brief, stating that the brief had been prepared and printed before the decision in the Boyd case was published, that the decision of the Supreme Court in that case would control, and that owing to the lack of any evidence that would justify remedial or compensatory damages the verdict in any event was for $1000 more than was permissible under this last decision of the Supreme Court. In my opinion the judgment should be affirmed on condition that respondent remit $1000 of the judgment recovered.